IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| STEPHENIE AND GABRIEL WOLF, <br> d/b/a LONE WOLF PHOTOGRAPHY, <br> and LONE WOLF PHOTOGRAPHY, <br> A SERIES OF MA'IITSOH, LLC, <br><br> Plaintiffs, <br><br> v. <br><br> COWGIRL TUFF CO., <br><br> Defendant. | § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § | 1:15-CV-1195 RP |

**ORDER**

Before the Court are Plaintiffs' Second Amended Complaint, (Dkt. 22), Defendant's Motion to Dismiss in Part Plaintiffs' Second Amended Complaint, (Dkt. 23), Plaintiffs' Response to Defendant's Motion to Partially Dismiss Plaintiffs' Second Amended Complaint, (Dkt. 25), and Defendant's Reply to Response to Defendant's Motion to Partially Dismiss Plaintiffs' Second Amended Complaint, (Dkt. 26). Having considered the parties' submissions, the record in this case, and the applicable law, the Court issues the following order.

**I. FACTUAL BACKGROUND**

Defendant's Motion to Dismiss in Part Plaintiffs' Second Amended Complaint is a request for a dismissal based on the pleadings. This factual discussion thus draws from Plaintiffs' Second Amended Complaint. Plaintiffs Stephenie and Gabriel Wolf "are rodeo photographers whose subjects are primarily rodeo competitors." (Dkt. 22, ¶ 10). For several years, they operated under the trade name Lone Wolf Photography. (*Id.*). In 2015, however, they created Ma'iitsoh, LLC, a Texas Series limited liability company, of which Lone Wolf Photography became a series member. (*Id.*). Defendant Cowgirl Tuff Co. is a manufacturer of apparel and related accessories marketed towards

1

participants in and fans of rodeo-related competition. (*Id.*, ¶ 14). Defendant also sponsors rodeo competitors, including one Lisa Lockhart. (*Id.*, ¶ 31).

This case involves four photographs taken by the Wolfs: two of Lisa Lockhart (the "LL1 photo" and the "LL2 photo"), one of Lari Dee Guy (the "LDG photo") and one of Kollin VonAhn (the "KVA photo"). (*Id.*, ¶ 11). On or about November 6, 2013, Plaintiffs entered into a contract with Defendant that gave Defendant approximately one year to use the KVA photo subject to specific limitations. (*Id.*, ¶¶ 16–17). Around six months later, on or about May 2, 2014, Plaintiff entered into a similar contract with Defendant for the use of the LL1 photo. (*Id.*, ¶¶ 18–19). Upon receipt of each photo, Defendant "promptly began repeatedly breaching" its contractual obligations by, inter alia, using the photos without the required copyright credit, using the photos outside the contractually specified time frames, and providing the photos to a third-party hotel chain for use in cross-promotional marketing campaigns. (*Id.*, ¶¶ 21–23). Defendant also obtained and used the LL2 and LDG photos without Plaintiffs' permission. (*Id.*, ¶ 24).

Plaintiffs thereafter contacted Defendant to ask that it compensate them for its misuse of the four photos. (*Id.*, ¶ 26). In response, Defendant sent Plaintiffs an "abusive and groundless" cease and desist letter threatening retaliatory litigation. (*Id.*, ¶¶ 26, 34). This letter accused Plaintiffs of "attempt[ing] to profit from the Cowgirl Tuff Victory Cross through the sale or licensing of photographs that prominently display [Defendant's] work" because the shirt being worn by Lisa Lockhart in the LL1 photo purportedly displayed Defendant's copyrighted "Victory Cross" design. (*Id.*, ¶ 29). As Plaintiffs tell it, "Defendant took the position that because the shirt that Ms. Lockhart was wearing in [the LL1 photo] may have borne some minor similarities to a design that Defendant had previously copyrighted, Plaintiffs were not legally allowed to demand that Defendant pay for [its] unauthorized use [of the photo]." (*Id.*, ¶ 30).

2

Additionally, at the time Defendant sent the cease and desist letter, Plaintiffs assert that they "had contracts for several work assignments" with Equibrand, one of their long-standing, main clients. (*Id.*, ¶31). Defendant knew or should have known of those contracts because "Equibrand and Defendant had an independent business relationship with one another separate from Plaintiffs, arising in part because Equibrand and Defendant sponsored some of the same rodeo competitors," including Ms. Lockhart. (*Id.*, ¶¶ 31, 34). Moreover, the LL1 photograph that Defendant had licensed from Plaintiffs, along with a number of other photographs in Plaintiffs' portfolio, had been produced as a result of Plaintiffs' work for Equibrand. (*Id.*, ¶ 31). "Plaintiffs had to seek permission before providing any images to Defendant pursuant to [their] contracts [with Equibrand], and Defendant knew of the origin of the photography." (*Id.*).

Defendant also purportedly "knew of the [negative] effect that the [cease and desist] letter would have on Equibrand's willingness to continue working with Plaintiffs." (*Id.*, ¶ 32). This knowledge was the product of its independent relationship with Equibrand along with its "nearly two decades" of experience "in the industry and in rodeo event sponsorship and promotion . . . [and its] familiarity with the commercial relationship surrounding rodeo events." (*Id.*, ¶¶ 32–33). Further, Defendant "engaged in direct communications with Equibrand regarding Plaintiffs in the same time frame as the cease and desist letter" and "encouraged Equibrand to cease [Equibrand's] collaboration with Plaintiffs." (*Id.*, ¶ 32). Defendant thus "knew and intended for its conduct to disrupt Plaintiffs' business relationship with Equibrand," which "had the intended effect": Equibrand subsequently sent Plaintiffs "written notice of termination terminating of all current and pending projects, specifically citing Defendant's threat of litigation as the reason for the termination." (*Id.*).

Without Plaintiffs' contracts with Equibrand, Plaintiffs was unable to gain access to the National Finals Rodeo. (*Id.*, ¶ 33). Losing their access to that event prevented Plaintiffs from being

able to take photographs for future customers and from meeting sponsors and competitors from whom to generate new business opportunities. (*Id.*). Then, due to Defendant's conduct, Plaintiffs had to abruptly withdraw from other of Ms. Lockhart's sponsors' consideration a number of Plaintiffs' photos. (*Id.*, ¶ 32). This purportedly cost Plaintiffs potential agreements and profits and harmed Plaintiffs' business reputation. (*Id.*, ¶ 34).

Accordingly, Plaintiffs in their Second Amended Complaint have alleged the following claims against Defendant: (1) breach of contract, (2) copyright infringement via online media, (3) copyright infringement via print media, (4) copyright infringement via unauthorized distribution, and (5) tortious interference with existing contracts, prospective contracts, and ongoing business relationships. (*Id.*, ¶¶ 36–48). Defendant has responded by filing a motion to dismiss Plaintiffs' tortious interference claims pursuant to Federal Rule of Civil Procedure 12(b)(6) for failing to state a claim upon which relief can be granted. Plaintiff has responded, Defendant has replied, and Defendant's motion to dismiss is now ripe for the Court's review.

## II. STANDARD OF REVIEW

When evaluating a motion to dismiss for failure to state a claim under Rule 12(b)(6) the complaint must be liberally construed in favor of the plaintiff and all facts pleaded therein must be taken as true. *Leatherman v. Tarrant Cty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 164 (1993); *accord Hux v. S. Methodist Univ.*, 819 F.3d 776, 780 (5th Cir. 2016). Although Federal Rule of Civil Procedure 8 mandates only that a pleading contain a "short and plain statement of the claim showing that the pleader is entitled to relief," this standard demands more than unadorned accusations, "labels and conclusions," "a formulaic recitation of the elements of a cause of action," or "naked assertion[s]" devoid of "further factual enhancement." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Rather, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. *Twombly*, 550 U.S. at 570. "A claim has facial plausibility

4

when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Determining the plausibility of a claim for relief is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679 (citation omitted). If "the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Iqbal*, 556 U.S. at 679. (quoting Fed. R. Civ. P. 8(a)(2)).

### III. DISCUSSION

Defendant asserts that Plaintiffs have failed to adequately plead their tortious interference with existing contract claim as well as their tortious interference with prospective business relations claim. It also argues that both of Plaintiffs' tortious interference claims are barred by the *Noerr-Pennington* doctrine. The Court addresses each of these grounds for dismissal below.

**A. The Tortious Interference with Existing Contract Claim**

In Texas, the elements of tortious interference with an existing contract are "(1) the existence of a contract subject to interference; (2) a willful and intentional act of interference; (3) the act was a proximate cause of the plaintiff's damages; and (4) actual damage or loss." *Texas Beef Cattle Co. v. Green,* 921 S.W.2d 203, 210 (Tex. 1996), *cited in Cuba v. Pylant*, 814 F.3d 701, 717 (5th Cir. 2016). Defendant argues that Plaintiffs have failed to sufficiently plead the first three of these elements.

**i. Existence of a Contract Subject to Interference**

First, Defendant argues that "Plaintiffs have failed to meet the first element [of a tortious interference with contract claim] by failing to identify a contract term subject to interference" and by "fail[ing] to designate a specific contract obligation that is the subject of interference by Defendant[]." (Dkt. 23 at 5) (citing *M-I LLC v. Stelly*, 733 F. Supp. 2d 759, 775 (S.D. Tex. 2010)).

The section of the *Stelly* court's order cited by Defendant involved a plaintiff that in its complaint alleged only that it "had valid contracts with certain customers" but otherwise "fail[ed] entirely to allege or designate a specific contract that [was] the subject of interference." *Stelly*, 733 F. Supp. 2d at 774. While a "reader might gather [from the facts stated that the plaintiff] had business relationships with at least seven different businesses," that was not enough to "allege[] the existence of a *contract* between the plaintiff and any of these businesses that obligated [those businesses] to use the [plaintiff's services]." *Id.* at 775 (emphasis in original).

The Court does not believe the complaint in *Stelly* and the complaint here are sufficiently similar so as to justify the same outcome. Plaintiffs have not described the supposed contracts in detail, but the facts alleged are enough from which to reasonably infer the existence of contracts subject to interference. Plaintiffs state that they had "a long-standing relationship with Equibrand," that the LL1 and LL2 photos were produced as a part of their work for Equibrand, and that they had a number of outstanding contracts with Equibrand for "work assignments" at the time of Defendant's purported interference. (Dkt. 22, ¶ 31). They further assert that "pursuant to [those] contracts" they "had to seek permission from Equibrand before providing any images to Defendant," and that the "contracts with Equibrand provided them with access to events such as the National Finals Rodeo . . . as [] photographer[s] for the event." (*Id.*, ¶¶ 31, 33). Lastly, Plaintiffs claim that Equibrand sent them "written notice of termination of all current and pending projects." (*Id.*, ¶ 32). Taking these facts as true, and reading the complaint in the light most favorable to Plaintiffs, the Court finds that Plaintiffs have adequately pleaded the existence of contracts subject to interference with Equibrand.

**ii. Willful and Intentional Act of Interference**

Second, Defendant alleges that Plaintiffs have "failed to plead facts showing that Defendant committed a willful and intentional act of interference" because "'[g]eneral claims of interference with a business relationship are insufficient to establish a tortious interference with contract claim.'" (Dkt. 23 at 6) (quoting *Rimkus Consulting Grp., Inc. v. Cammarata* 688 F. Supp. 2d 598, 675 (S.D. Tex. 2010) (citing *Playboy Enters., Inc. v. Editorial Caballero, S.A. de C.V.*, 202 S.W.3d 250, 265 (Tex. App.—Corpus Christi 2006, pet. denied))). Defendant points to Plaintiffs' statement that "Defendant knew and intended for its conduct to disrupt Plaintiffs' *business relationship* with Equibrand" as demonstrative of such an inadequate general claim. (Dkt. 23 at 6) (quoting (Dkt. 22, ¶ 32)) (emphasis in Defendant's motion). The Court is not convinced that because Plaintiffs in their complaint referred to Defendant's alleged actions as interference with a "business relationship" as opposed to with a "contract" or "contracts" renders the interference with contract claim uncognizable. Nor are the terms "business relationship" and "contractual relationship" mutually exclusive.[1]

To show a willful and intentional act of interference, "a plaintiff is not required to prove intent to injure but rather 'only that the actor desires to cause the consequences of his act, or that he believes that the consequences are substantially certain to result from it.'" *Amigo Broad., LP v. Spanish Broad. Sys., Inc.*, 521 F.3d 472, 490 (5th Cir. 2008) (quoting *Sw. Bell Tel. Co. v. John Carlo Tex., Inc.*, 843 S.W.2d 470, 472 (Tex. 1992)). In other words, the alleged tortfeasor must have carried out the interfering act with "the desire[] to interfere with [the] contract or [the belief] that interference was substantially certain to result from its actions." *See Sw. Bell Tel. Co.*, 843 S.W.2d at 472. Further, "the interfering party must have 'actual knowledge of the contract or business relation in question, or knowledge of facts and circumstances that would lead a reasonable person to believe in the existence

---

[1] Further, "Texas courts have treated tortious inference with a 'contract' and tortious interference with 'business relationships' as separate causes of action with slightly different elements." *McGowan & Co., Inc. v. Bogan*, 93 F. Supp. 3d 624, 654 n.50 (S.D. Tex. 2015) (collecting cases). The parties here have only briefed the tortious interference with an existing contract cause of action, and so that is what the Court addresses.

7

of the contract or business relationship.'" *Id.* (quoting *Steinmetz & Assocs., Inc. v. Crow,* 700 S.W.2d 276, 277–78 (Tex. App.—San Antonio 1985, writ refused, n.r.e.)).

The Court finds that Plaintiffs have alleged facts sufficient to satisfy the above standard for initial pleading purposes. Plaintiffs claim that Defendant had knowledge of the fact that numerous of Plaintiffs photos, including the LL1 photo it licensed from Plaintiffs—the subject of which photo is a competitor sponsored by both Equibrand and Defendant—came about as a result of Plaintiffs' work for Equibrand. *See* (Dkt. 22, ¶ 31). Defendant also purportedly "knew of the effect that the [cease and desist] letter would have on Equibrand's willingness to continue working with Plaintiffs" due to Defendant's experience and knowledge in the niche area of rodeo competition industry along with Defendant's independent relationship with Equibrand. (*Id.*, ¶ 32). Finally, Defendant allegedly "engaged in direct communications with Equibrand regarding Plaintiffs in the same time frame as the cease and desist letter" and "encouraged Equibrand to cease its collaboration with Plaintiffs." (*Id.*). Equibrand then sent a written notice of termination to Plaintiffs that "specifically cit[ed] Defendant's threat of litigation as the reason for the termination." (*Id.*, ¶ 32).

These facts allow for the reasonable inference that Defendant knew of or reasonably should have believed in the existence of the contracts in question, as well as that Defendant desired to interfere with the contracts or believed such interference was substantially certain to result from its actions. *See Sw. Bell Tel. Co.*, 843 S.W.2d at 472.

### iii. Proximate Cause

"Establishing causation requires that the plaintiff bring forth sufficient facts so that the evidence, and logical inferences drawn from the evidence, support a reasonable probability that the defendant's acts or omissions were a substantial factor in bringing about injury." *Richardson-Eagle, Inc. v. William M. Mercer, Inc.*, 213 S.W.3d 469, 474 (Tex. App.—Houston [1st Dist.] 2006, pet. denied) (citing *Union Pump Co. v. Allbritton*, 898 S.W.2d 773, 775 (Tex. 1995)). Additionally, while the Texas

8

Supreme Court and Texas intermediate courts have "not expressly listed 'active participation' as a separate element of a claim for tortious interference," Texas intermediate courts "do require proof of it to establish proximate cause." *Lincoln Gen. Ins. Co. v. U.S. Auto Ins. Servs., Inc.*, 787 F.3d 716, 731 (5th Cir. 2015). Thus, "[t]o establish proximate cause, a party must show that 'the defendant took an active part in persuading a party to a contract to breach it.'" *Amigo Broad., LP v. Spanish Broad. Sys., Inc.*, 521 F.3d 472, 493 (5th Cir. 2008) (quoting *Davis v. HydPro, Inc.*, 839 S.W.2d 137, 139 (Tex. App.—Eastland 1992, writ denied)).

Defendant argues that "[n]owhere does the Complaint set forth facts alleging any kind of interference or persuasion of Equibrand to breach existing contractual obligations with Plaintiffs." (Dkt. 23 at 7). The Court disagrees. Plaintiffs have asserted that Defendant contacted Equibrand and encouraged Equibrand to sever ties with Plaintiffs. (Dkt. 22, ¶ 32). This is sufficient to demonstrate, at this point in the litigation, that Defendant took an active part in persuading Equibrand to breach its contracts with Plaintiffs.[2]

## B. The Tortious Interference with Prospective Business Relations Claim

To state a claim for tortious interference with prospective business relations, a plaintiff must plead the following elements:

> (1) [T]here was a reasonable probability that the plaintiff would have entered into a business relationship with a third party; (2) the defendant either acted with a conscious desire to prevent the relationship from occurring or knew the interference was certain or substantially certain to occur as a result of the conduct; (3) the defendant's conduct was independently tortious or unlawful; (4) the

---

[2] It is not clear that the tortious interference with existing contract claim would survive absent Defendant's alleged direct communications with Equibrand. For example, in *Dibon Solutions, Inc. v. Nanda*, the Fifth Court of Appeals of Texas addressed a situation in which the defendant-appellees had "sent communications to several of [the plaintiff's] customers and [the plaintiff's] bank, accusing [the plaintiff] of being subject to: (1) an IRS investigation; (2) an ICE and FBI investigation for money laundering, visa fraud, human trafficking, and harboring illegal aliens; (3) a DOL investigation for unpaid back wages; (4) multiple lawsuits; (5) making bankruptcy threats; (6) diversion of assets; (6) multiple liens; (7) non-performance on bank loans; and (8) forging documents." No. 05-12-01112-CV, 2013 WL 3947195, at *1 (Tex. App.—Dallas 2013, no writ). Although one of the plaintiff's customers, after receiving this communication, breached its contract with the plaintiff, the court found that there was "no evidence . . . showing appellees took an active part in persuading" the customer to do so. *Id.*, at *3. This question is not before the Court and the Court takes no stance on it.

9

> interference proximately caused the plaintiff injury; and (5) the
> plaintiff suffered actual damage or loss as a result.

*Coinmach Corp. v. Aspenwood Apartment Corp.*, 417 S.W.3d 909, 923 (Tex. 2013) (citations omitted).

Defendant provides a three-element formulation of the cause of action and then argues that Plaintiffs "have failed to plead two crucial elements," namely to "plead facts that would indicate that Defendant prevented the formation of another contract" as well as "to allege the commission of independently tortious conduct." (Dkt. 23 at 8).

The first deficiency identified by Defendant is not one of the elements of this cause of action as defined by the Texas Supreme Court in *Coinmach*. However, in making its argument, Defendant states that "Plaintiffs at most invoke unspecified 'business prospects' and 'prospective contracts'" and that "Plaintiffs' factual allegations rely on the alleged contracts and/or business relationship with Equibrand, not any other business prospect." (Dkt. 23 at 8). Defendant also cites to *U.S. Enercorp, Ltd. v. SDC Montana Bakken Exploration, LLC*, 966 F. Supp. 2d 690, 703 (W.D. Tex. 2013), as inferentially supportive of its argument. (*Id.*). The *Enercorp* court dismissed a tortious interference with prospective business relations claim because the facts pled by the plaintiff in its complaint showed that a contract had been entered into between the plaintiff and the third party *despite* the supposed interference by the defendant. *Id.* That "the contract that was eventually formed" was ultimately "not as beneficial" to the plaintiff did not mean that "any particular contract was *prevented from forming*." *Id.* (emphasis in original). The Court therefore reads Defendant to be asserting as its first point of contention that the first and fourth elements of the cause of action, as most recently defined by the Texas Supreme Court, have not been met, i.e. that Plaintiffs have failed to identify which prospective non-Equibrand business relationships Plaintiffs would have had a reasonable probability of entering into but for Defendant's actions.

Plaintiffs, despite alleging in the complaint that "[a]t the time Defendant sent the cease and desist letter, Plaintiffs had other photographs under consideration with some of Lisa Lockhart's

10

other sponsors," (Dkt. 22, ¶ 34), have responded to Defendant's argument by stating only that "Defendant ensured that Equibrand would not undertake future business with Plaintiffs." (Dkt. 25 at 6). This response appears to acknowledge the lack of detail in Plaintiffs' complaint regarding tortious interference with prospective non-Equibrand business relationships. While Plaintiffs need not assert facts from which it is reasonably inferable that a prospective contract "would have *certainly* been made but for [Defendant's] interference," they must allege more than that "mere negotiations . . . have taken place." *See Hill v. Heritage Resources, Inc.*, 964 S.W.2d 89, 109 (Tex. App.—El Paso 1997, pet. denied) (emphasis added); *accord Richardson-Eagle, Inc.*, 213 S.W.3d at 475. The complaint here fails to pass this threshold vis-à-vis Plaintiffs' prospective non-Equibrand business relationships.[3]

However, Defendant's argument is not convincing as to Plaintiffs' claims regarding their relationship with Equibrand. A tortious interference with prospective business relations claim can include interference with "continuing business relationships," *Astoria Industries of Iowa, Inc. v. SNF, Inc.*, 223 S.W.3d 616, 633 (Tex. App.—Fort Worth 2007, pet. denied), and "a preexisting business relationship can suffice to show a reasonable probability of prospective contractual relations." *Cooper v. Harvey*, No. 3:14-CV-4152-B, 2016 WL 4427481, at *11 (N.D. Tex. Aug. 21, 2016) (citing *N. Cypress Med. Ctr. Operating Co. v. Gallagher Ben. Servs., Inc.*, No. 4:11-CV-00685, 2012 WL 2870639, at *7 (S.D. Tex. July 11, 2012)). Thus, for substantially the same reasons as already discussed in the

---

[3] As of 2008, "[t]he Texas Supreme Court ha[d] not yet set out all the elements of a tortious interference with a prospective business contract or relations claim, and the [Texas] appellate courts ha[d] not been uniform in their characterization of such actions." *See Nano-Proprietary, Inc. v. Canon, Inc.*, 537 F.3d 394, 403 (5th Cir. 2008) (quoting *Apani Sw., Inc. v. Coca-Cola Enters., Inc.*, 300 F.3d 620, 634 (5th Cir. 2002)). Some Texas intermediate courts required identifying a reasonable probability that the parties would have entered into a *business relationship*, while other intermediate courts required identifying a reasonable probability that the parties would have entered into a *contractual relationship*. *Id*. *Coinmach*, decided in 2013, may indicate the Texas Supreme Court's endorsement of the first approach. *See Coinmach*, 417 S.W.3d at 923 (citing to *Wal-Mart Stores, Inc. v. Sturges*, 52 S.W.3d 711, 713 (Tex. 2001) for the proposition that "Texas law protects contracts and business relations from tortious interference" and stating that the first element of a tortious interference with prospective business relations claim is that "there was a reasonable probability that the plaintiff would have entered into a business relationship with a third party"); *but compare id*. at 924 (agreeing with the petitioner that "a plaintiff asserting tortious interference with prospective business relations must prove not only that the defendant committed an independently tortious or wrongful act, but also that the act interfered with a reasonably probable contract that would have been entered into but for the interference"). The Court need not decide this issue, as Plaintiffs here have alleged no facts supporting the reasonable inference that there was a "reasonable probability of *either* an impending business relationship *or* contractual relationship." *See Nano-Proprietary, Inc.*, 537 F.3d at 404 (emphasis added).

context of Plaintiffs' tortious interference with existing contract claim, Plaintiffs have set out facts sufficient to plead that Defendant prevented either Plaintiffs' "continuing business relationship" or Plaintiffs' prospective contracts with Equibrand.[4] See *N. Cypress*, 2012 WL 2870639, at *7 ("[F]uture business relations were reasonably probable because [the plaintiff] and [the third party] had a preexisting relationship and contract . . . the [complaint] does more than merely conclusorily recite the elements of [the] cause of action.").

Lastly, the second deficiency identified by Defendant is that Plaintiffs have not pointed to any independently tortious act by Defendant. (Dkt. 23 at 8). The independently tortious act alleged by Plaintiffs is Defendant's tortious interference with Plaintiffs' existing contracts with Equibrand.[5] That is sufficient at this stage of the proceedings.

## C. *Noerr-Pennington* Immunity

### i. Legal Standard

The *Noerr-Pennington* doctrine originates from two Supreme Court cases: *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961) and *United Mine Workers of America v. Pennington*, 381 U.S. 657 (1965). "The essence of the doctrine is that parties who petition the government for governmental action favorable to them cannot be prosecuted under the antitrust laws even though their petitions are motivated by anticompetitive intent." *Video Int'l. Production, Inc. v. Warner-Amex Cable Communications, Inc.*, 858 F.2d 1075, 1082 (5th Cir. 1988).

Despite its beginnings in the antitrust field, the doctrine has now been expanded to "protect first amendment petitioning of the government from claims brought under federal and state laws, including . . . common-law tortious interference with contractual relations." *See id.* at 1084. Such "petitioning immunity" extends to "those acts reasonably and normally attendant upon effective

---

[4] *See supra*, note 3.
[5] The Court liberally construes the complaint in favor of Plaintiffs in determining that the underlying tort here is Defendant's active part in persuading Equibrand to breach its contracts with Plaintiffs. Absent this, it is not clear whether the sending of the cease and desist letter alone would satisfy this requirement. *See supra*, note 2.

litigation," including threats of litigation when made in good faith, i.e. "[i]f litigation is in good faith, a token of that sincerity is a warning that it will be commenced and a possible effort to compromise the dispute." *Coastal States Mktg., Inc. v. Hunt*, 694 F.2d 1358, 1367 (5th Cir. 1983); *see GoForIt Ent., LLC v. DigiMedia.com L.P.*, 750 F. Supp. 2d 712, 742 (N.D. Tex. 2010) ("*Noerr-Pennington* immunity can apply to trademark owners' attempts to protect their intellectual property rights."); *March Madness Athletic Ass'n L.L.C. v. Netfire, Inc.*, No. CIV.A. 3:00-CV-0398R, 2002 WL 32168078, at *1 (N.D. Tex. June 4, 2002) (Buchmeyer, J.) (holding, without discussion, that trademark owners' cease and desist letters and invocation of registrar's domain name dispute resolution procedure were immunized under *Noerr-Pennington*).

"The [Supreme] Court has allowed only one exception to the *Noerr-Pennington* doctrine—the 'sham' exception." *Bayou Fleet, Inc. v. Alexander*, 234 F.3d 852, 861 (5th Cir. 2000) (citing *Omni Outdoor Advertising, Inc.*, 499 U.S. 365, 380 (1991)). The applicability of the sham exception is established via a two-part inquiry:

> First, the lawsuit must be objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits. If an objective litigant could conclude that the suit is reasonably calculated to elicit a favorable outcome, the suit is immunized under *Noerr,* and an antitrust claim premised on the sham exception must fail. Only if challenged litigation is objectively meritless may a court examine the litigant's subjective motivation. Under this second part of our definition of sham, the court should focus on whether the baseless lawsuit conceals "an attempt to interfere *directly* with the business relationships of a competitor," through the "use of the governmental *process*—as opposed to the *outcome* of that process—as an anticompetitive weapon."

*Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 60–61 (1993) (emphasis in original) (citations omitted).

Finally, in the Fifth Circuit, "the *Noerr–Pennington* doctrine should be raised as an affirmative defense." *Bayou Fleet, Inc.*, 234 F.3d at 860; *see Acoustic Sys., Inc. v. Wenger Corp.*, 207 F.3d 287, 295 (5th Cir. 2000) ("Although the *Noerr–Pennington* doctrine is frequently referred to as an 'antitrust

immunity,' it provides only a defense to liability, not an immunity from suit." (citing *See We, Inc. v. City of Philadelphia,* 174 F.3d 322, 326 (3d Cir. 1999); *Segni v. Commercial Office of Spain,* 816 F.2d 344, 345–46 (7th Cir. 1987))). As with other affirmative defenses, if the applicability of the *Noerr-Pennington* doctrine "appears on the face of the pleadings, dismissal under Rule 12(b)(6) may be appropriate." *See Miller v. BAC Home Loans Servicing, L.P.*, 726 F.3d 717, 726 (5th Cir. 2013) (citing *Kansa Reins. Co. v. Cong. Mortg. Corp. of Tex.*, 20 F.3d 1362, 1366 (5th Cir. 1994) (internal quotation marks omitted).

### ii. Defendant's Argument

Defendant argues that its "cease-and-desist letter and the alleged communications about the lawsuit with Equibrand . . . are forms of activities that are protected by the *Noerr-Pennington* doctrine absent proof of sham." (Dkt. 23 at 9).[6] It asserts that Plaintiffs' complaint "makes clear that Defendant has protectable interests in its rights under the Copyright Act," that Plaintiffs "merely dispute the degree of similarity between the protected designs and the designs utilized by Plaintiffs," and that the cease and desist letter "is associated with Defendant's good-faith enforcement of rights under the Copyright Act." (Dkt. 23 at 9).

In assessing Defendant's argument, it must be remembered that "a plaintiff typically is not required to plead, in the complaint, facts that negate an affirmative defense." *Jaso v. The Coca Cola Co.*, 435 F. App'x 346, 351 (5th Cir. 2011); *accord Pub. Health Equip. & Supply Co. v. Clarke Mosquito Control Products, Inc.*, 410 F. App'x 738, 741 (5th Cir. 2010) ("[P]leadings need not identify every element of [a] claim, particularly where the contested elements relate to [an] affirmative defense." (quoting *EPCO Carbon Dioxide Prods., Inc. v. JP Morgan Chase Bank*, 467 F.3d 466, 470 (5th Cir. 2006)). They need only state an adequate claim. And because "an adequately stated claim 'may be supported

---

[6] Plaintiffs argue that it is "entirely unclear" why Defendant's direct communications with Equibrand encouraging Equibrand not to work with Plaintiffs should be considered acts reasonably attendant upon litigation and immunized under *Noerr-Pennington*. (Dkt. 25 at 9 n.2). The Court need not answer that question at this stage of the proceedings because the applicability of the defense does not appear on the face of the pleadings.

14

by showing *any set of facts* consistent with the allegations in the complaint,'" *Id.* at 352 (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 563 (2007)) (emphasis added), "dismissal for failure to state a claim based on [an affirmative defense] should be granted only when 'the plaintiff's potential rejoinder to the affirmative defense [is] foreclosed by the allegations in the complaint.'" *Id.* (quoting *Goodman v. Praxair, Inc.*, 494 F.3d 458, 466 (4th Cir. 2007) (en banc); *cf. EPCO*, 467 F.3d at 471 (holding that dismissal at the 12(b)(6) stage based on statute of frauds defense was improper because proof of a written contract was not "foreclosed by the face of [the plaintiff's] pleadings").

With this standard in mind, the Court is not convinced that *Noerr-Pennington* immunity is apparent from the face of the pleadings. Nothing on the face of the complaint forecloses the possibility that Plaintiffs will be able to show that Defendant's activities fall under the sham exception to *Noerr-Pennington* immunity. Plaintiffs describe significant differences between Defendant's purportedly copyrighted image and the design of Ms. Lockhart's shirt:

> Assuming that the design attached to Defendant's November 5, 2015 letter is an accurate representation of the Victory Cross design, LL1 clearly depicts a substantially different design. First, the shirt that Ms. Lockhart is wearing in LL1 bears the slogan "Never Give Up," whereas the Victory Cross design provided to Plaintiffs bears the words "Believe," "Peace," and "Victory." Additionally, the design on the back of Ms. Lockhart's shirt in LL1 incorporates four crosses into the design, whereas the Victory Cross design has only one. The design on the back of Ms. Lockhart's shirt is therefore substantially different from the Victory Cross design purportedly copyrighted by Defendant.

(Dkt. 22, ¶ 28).

These facts do not foreclose the possibility that Defendant's conduct was "objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits." *See Prof'l Real Estate Investors*, 508 U.S. at 60. Neither do Plaintiffs' alleged facts foreclose the possibility that Defendant acted with the subjective motivation "to interfere directly with the business relationships of a competitor." *See id.* at 60–61; *supra* Part III.A–B.

Accordingly, the Court finds that the affirmative defense of *Noerr-Pennington* immunity does not appear on the face of the pleadings. In other words, Plaintiffs' "potential response to the affirmative defense of [*Noerr-Pennington* immunity]"—that the sham exception could be applicable—is not "'foreclosed by the allegations in the complaint.'" *See Jaso*, 435 F. App'x at 353 (quoting *Goodman*, 494 F.3d at 466).[7]

### IV. CONCLUSION

Defendant's Motion to Dismiss in Part Plaintiffs' Second Amended Complaint (Dkt. 23) is **GRANTED IN PART** and **DENIED IN PART**. Specifically, the Court **DISMISSES WITHOUT PREJUDICE** Plaintiffs' claims of tortious interference with prospective non-Equibrand business relationships. All other relief requested is **DENIED**.

**SIGNED** on September 2, 2016.

_____
ROBERT PITMAN
UNITED STATES DISTRICT JUDGE

---

[7] Additionally, it is only in "relatively rare circumstances where facts sufficient to rule on an affirmative defense are alleged in the complaint." *Goodman v. Praxair*, 494 F.3d 458, 464 (4th Cir. 2008). The applicability of the sham exception to Defendant's affirmative defense of *Noerr-Pennington* immunity requires the Court to first assess the merits of the threatened litigation underlying the cease and desist letter and, if they are objectively lacking, to then assess Defendant's subjective motivation in sending the letter. These inquiries are typically only "properly analyzed through a consideration of evidence outside of the pleadings . . . and as such, are not appropriately considered in the present Rule 12(b)(6) context." *See Morrone Co. v. Barbour*, 241 F. Supp. 2d 683, 690 (S.D. Miss. 2002) (denying the defendant's motion to dismiss based on *Noerr-Pennington* immunity).